UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| AMY S. PELLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:13 CV 1789 CDP |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision denying Amy Pellin's application for a period of disability, disability insurance benefits, and supplemental security income under Title II and Title XVI of the Social Security Act (Act). Judicial review of the Commissioner's final decision under Title II is available under Section 205(g) of the Act. 42 U.S.C. § 405(g). Review of the Commissioner's final decision under Title XVI is available under Section 1631(c)(3) of the Act. 42 U.S.C. § 1383(c)(3). Pellin alleges that she is disabled because she suffers from chemically induced bronchial reactivity and situational depression (quiescent), but the Administrative Law Judge found that she was not disabled. Because the Commissioner's decision is not supported by substantial evidence I will reverse the Commissioner's final decision and remand this case to the Commissioner for further consideration.

## Procedural History

On September 15, 2010, Amy Pellin filed for a period of a period of disability, disability insurance benefits, and supplemental security income. Both applications were denied on November 17, 2010 and Pellin filed a written request for a hearing on December 6, 2010. On March 5, 2012, a hearing was held before an ALJ and on March 28, 2012, the ALJ issued a decision finding that Pellin was not disabled. The Appeals Council denied Pellin's request for review on July 22, 2013. Therefore, the ALJ's determination stands as the final decision of the Commissioner of Social Security.

## Evidence before the ALJ

Pellin was thirty-four years old when the ALJ issued his decision. She has a Bachelor's Degree of Science and Biology from the University Of Missouri-St. Louis. Pellin's last reported employment for which earnings for which state or federal taxes were paid was in 2007 at JC Penney's. She also worked at home as an office assistant for her husband's company in 2009 and 2010. Pellin claims she is unable to work because of chemically induced bronchial reactivity, shortness of breath, dizziness, chest pains, and brain fog.

### Pellin's Application for Benefits

In her application for benefits, Pellin stated that the following conditions limited her ability to work: chemically induced bronchial reactivity, shortness of

breath, brain fog, cognitive impairment, forgetfulness, chest pain, dizziness, and nausea. (Tr. 148). She claimed that her impairments became severe enough to prevent her from working in January 2007.

In her function report, Pellin said she tried to care for her family, but often had trouble and that her in-laws "usually have to take over my daily activities." She also stopped her hobbies including biking, running, taking her kids out, and more. To summarize her condition Pellin stated:

> I have gone from a carefree, outgoing, personable graduate who was an avid athlete and fun person to someone who is unable to do almost anything w/out wearing a mask and using extreme cautionary measures to just prevent shortness of breath, chest pains, dizziness, cognitive impairment, and other symptoms and complications due to this disability.

(Tr. 177). Pellin also provided episode logs she had kept on instruction from Dr. Tuteur detailing more than 90 episodes where even minimal and incidental exposure to a wide range of triggers caused her to suffer impairments. The triggers included exposure to such diverse things as gasoline fumes, candles, dry-erase markers, and new shoes. (Tr. 198-210, 222-240).

## Medical Records

Pellin first reported respiratory problems in 2007. On January 2007, Dr. Charles Sincox M.D., first examined Pellin when she complained of shortness of breath (SOB), dizziness, nausea, chest pain, and numbness in her extremities. On January 22, 2007, a cardiac stress test was performed showing that she suffered

chest pains upon physical exertion. Two days later, Pellin was admitted to St. John's Mercy Hospital emergency room on January 25, reporting chest pains and SOB. She was diagnosed with reactive airway disease. Dr. Sincox released her on February 5, saying Pellin could return to work, but referred her to a specialist, Dr. Michael Brischetto, M.D. After an examination Dr. Brichetto stated that Pellin might suffer from reactive airway dysfunction syndrome (RADS) due to chemical solvent exposure. (Tr. 258). Pellin was also examined by Dr. Thomas Hyer M.D., three times between February 5 through August 6, 2007. A pulmonary function test showed mild airway obstruction with $FEV1^{1}$/FVC of 70%. Anything below 80% is abnormal. Dr. Hyer examined Pellin again on May 7 after she tried to work outside surveying and reported that she had chest pain, SOB and trembling hands, he diagnosed her with allergic and possible vasomotor rhinitis.[2] He also found no "permanent injury" and prescribed Pellin Nasonex. On August 6, 2007 he discharged her, describing her as saying her condition was much improved. (Tr. 270).

Pellin saw Dr. Robert Onder M.D., three times between July 3 and August 25, 2009. He diagnosed her with "allergic rhinitis and vasomotor rhinitis" attributing her breathing problems to anxiety and vocal cord dysfunction. Dr.

---

[1] Forced Expiratory Volume.
[2] Vasomotor rhinitis is not caused by an infection or allergy. The exact cause is unknown. Symptoms are triggered by something that irritates the nose, such as: a dry atmosphere, air pollution, alchohol, certain medications, spicy foods, strong emotions. http://nlm.nih.gov/medlineplus/ency/article/001648.htm (last visited June 12, 2014).

Onder also opined that Pellin's exposure to household chemicals was not injuring her health or lung function. (Tr. 532). On September 8, 2009 Pellin saw Dr. Evelio Sardina M.D. Dr. Sardina called her SOB a "chronic problem" and diagnosed her with dyspnea,[3] cough, allergic rhinitis due to abnormal pulmonary functioning test, and RADS. He also stated that he believed that Pellin's RADS were "likely from inhalational occupational exposure," related to her work with solvents. (Tr. 363). He described the problem as recurrent and stated it was getting worse. On October 7, Dr. Sardina's nurse instructed Pellin to avoid triggers including "tobacco smoke, chlorine, gasoline fumes, detergent, bleach, xylene, and mites." Dr. Sardina referred Pellin to an occupational asthma specialist, Dr. Peter Tuteur, M.D.[4] (Tr. 368).

Before seeing Dr. Tuteur, Pellin was once again examined by Dr. Sincox for an assessment in order to obtain a referral. Pellin told Dr. Sincox that she was having frequent episodes of reactive airway problems from a wide range of triggers, but particularly vehicle exhaust fumes. An examination of the record and a physical was positive for multiple severe respiratory symptoms including SOB, coughing, and chest tightness. Dr. Sincox diagnosed her with RADS with multiple

_____

[3] Dyspnea is defined as "Shortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude." *Stedman's Medical Dictionary*, (27th ed. 2000).
[4] Dr. Peter Tuteur M.D., is an Associate Professor of Medicine at Washington University in St. Louis and is the Director of the Pulmonary Function Laboratory.

triggers and on January 22, 2010 he authorized the referral to Dr. Tuteur.  (Tr. 578-79).

Dr. Tuteur first saw Pellin on February 26, 2010 for further evaluation of her pulmonary health status.  Dr. Tuteur examined Pellin and concluded that her symptoms were a "response to the exposure to volatile chemicals (xylene and glycol ether)."  This had resulted in systemic and respiratory symptoms all of which subsequently recur not only in her workplace environment, but also when exposed to a wide variety of irritants including perfume, hairspray, and diesel exhaust.  Symptoms resulting from exposure to these triggers could last for days and he noted a specific occasion where exposure to a chlorine tablet lasted for a month.  He also noted that while Pellin's respiratory systems tended to improve when treated with a beta2 agonist, they were not resolved and that systemic symptomatology could last for weeks.  He recommended that she continue to take her medication, but did not perform any additional tests because of Pellin's pregnancy.  (Tr. 538-540)

According to Dr. Tuteur "The clinical story, both subjective and objective data, strongly and rather uniquely indicate the presence of **chemically induced bronchial reactivity**."  (emphasis in original).   As treatment he prescribed albuterol (2 puffs every 4 hours) and Serevent in order to blunt an "inadvertent environmental breach" that could exacerbate her condition.  He also instructed

6

Pellin to do everything possible to prevent exposure to triggers. To accomplish this he requested that she remove all aerosol sprays from her home, use only water to clean her home, and take other steps to avoid triggers along with keeping a diary to help develop a list of irritants. (Tr. 539-40).

Dr. Tuteur examined Pellin again on May 7, 2010, and confirmed the bronchial reactivity diagnosis. Pellin had followed Dr. Tuteur's recommended treatment course, but despite this had suffered breaches to the environment resulting in breathlessness, chest pains, and headaches that lasted for several days. Dr. Tuteur conducted both a physical examination and a methaholine challenge test,[5] which was "markedly positive . . . indicative of bronchial reactivity." He concluded that based on "all available medical data it is unequivocal that Ms. Pellin has chemically induced bronchial reactivity." (Tr. 545). Dr. Tuteur advised Pellin to avoid areas known to contain triggers (like Walmart), use special washers that use a tiny amount of soap and told her that if her home was professionally cleaned she leave for at least 24 hours. He also recommended that she continue treatment with Advair. Pellin had also started wearing an N95[6] mask to block odors when outside, but this failed to prevent exposure to triggers. (Tr. 558).

---

[5] Methacholine is an agent that, when inhaled, causes the airways to spasm and narrow. http://www.webmd.com/asthma/guide/lung-function-tests-asthma.
[6] N95 respirators are certified by the National Institute for Occupational Safety and Health (NIOSH) as designed to filter out 95% of very small airborne particles. www.fda.gov.

On July 9, 2010, Dr, Tuteur stated his diagnosis[7] and also stated that exposure to workplace environment was the cause. He also stated that her condition was permanent and that Pellin needed "fastidious environmental control . . . at all times." (emphasis in original). When asked about Pellin's employability on the open market Dr. Tutuer responded "Not at all easily. Environmental control must be maintained so that triggers . . . are totally avoided." (emphasis in original) (Tr. 536).

On September 17, 2010 Dr. Tuteur stated that Pellin and her husband were "aggressively pursuing environmental control" but that inadvertent breaches had occurred leading to SOB, chest tightness, dizziness, and other symptoms. He went on to state, "from a medical standpoint she [Pellin] is totally and permanently disabled." (Tr. 554).

Pellin visited Dr. Tuteur again on March 11, 2011. After an examination he reiterated that Pellin was "totally and permanently disabled to such an extent that she is unable to work in an environment, which even from time-to-time, may contain triggers that tend to exacerbate the clinical condition." On September 23, 2011, Dr. Tuteur examined Pellin again. He found that Pellin was still attempting fastidious environmental control, but that she was "regularly thwarted" by a variety of circumstances ranging from ambient exposure to perfume to driving behind an

---

[7] Dr. Tuteur's diagnosis was "chemically induced bronchial reactivity manifested by the recurrent acute exacerbations despite meaningful broncho-reactive Rx." (Tr. 551).

old vehicle in traffic. He also noted that most of her difficulties involved "routine chores around the home and in the neighborhood." Dr. Tuteur stated that Pellin was having difficulty adjusting to her new limitations and restrictions and once again emphasized the necessity of avoiding triggers with her. (Tr. 676-679).

On November 6, 2011, Pellin reported to Mercy Hospital emergency room complaining of SOB after going to multiple stores the day before. Pellin stated that because of her chemical hypersensitivity she had a severe respiratory response to accidentally inhaling air freshener and clothing perfume. (Tr. 682-84). As treatment, the hospital prescribed prednisone to take with breakfast for the next three days. Pellin was then discharged after she started feeling better. (Tr. 693).

On March 13, 2012, Pellin visited Dr. Tuteur. He noted that Pellin was working hard to maintain fastidious environmental control, but there had been severe reactions to intermittent exposure. Inadvertent exposure to minor irritants caused symptoms that would last twelve hours to four days, with symptoms ranging from breathlessness to "systematic malaise." (Tr. 698).

**Testimony Before the ALJ**

On March 15, 2012, Pellin testified at a hearing before the ALJ. She stated that she was thirty-four years old and married with three children.

The ALJ first questioned Pellin about her previous work experience. Pellin testified that she had worked as an intern at Monsanto from 2000-2002 as a lab

tech and that she had not received her work related injury there.  She then testified that she went to work for Lumimove and Crosslink where she was a lab tech working with drug related polymers.  This was different than her work at Monsanto because it involved more chemicals.

Next, Pellin testified about her time working as an office assistant in her husband's business, Pellin Surveying, from February 2009 to September 10, 2010.  Pellin said that "[she] had attempted to work," but she didn't really know what her condition was and had problems working.  There were no tax records of this work because she had not been a W-2 employee.  Pellin described her work as an office assistant saying she "basically answered phones, printed out things for a little while, but essentially answering the telephone."  She also testified she never had to lift anything heavier than a ream of paper.  (Tr. 32-33).

The ALJ asked if she had stopped working at her husband's company because it didn't have much business.  Pellin responded that it was because of her condition.  The ALJ pressed her on the issue, asking if she had also stopped working because of her husband's business and Pellin admitted that yes, that was also a factor.  The ALJ also asked about Pellin's children (born on February 28, 2009 and March 8, 2010) and Pellin stated that her children did stay at home with her.  Pellin also stated that she had pending workers compensation claims against both Lumimove and Crosslink.  (Tr. 33-34).

Finally the ALJ asked her why Pellin felt her breathing impediment rendered her disabled and unable to perform real work.  Pellin answered "I have issues on a daily basis.  My condition is, is related to thousands of organic compounds . . . everything from ink in pens to the deodorant to paints to glues."  She has daily issues with things at home.  She "can't use diapers" and that she often had to get rid of items including "children's toys," and "even birthday balloons."  (Tr. 35).

Pellin was then questioned by her attorney.  She stated that there were no stores she could go to without exposing herself to triggers.  She also stated that she had tried to pump gas while wearing a mask, but that it made her "brain fog" and it would force her to pull over.  After exposure her symptoms, including SOB, chest pains, and numbness in extremities, can last for days.  Pellin said that she was not able to wait in the lobby before the hearing because the perfume from others had made her nauseous and dizzy, forcing her to wait in a private room.  (Tr. 38-40).

The last witness was Dr. John McGowan, a vocational expert (VE).  The ALJ informed the VE that Pellin's work at Lumimove, Monsanto, and as an office assistant were all substantial gainful activity and then posed a hypothetical.  The ALJ asked whether a woman Pellin's age that "should avoid even moderate exposure to fumes, odors, dust and gases," would be able to perform past relevant

work.  The VE responded that given the restrictions Pellin would be unable to work in the lab, but should be able to work as a general clerk.[8]  (Tr. 41-42).

Pellin's attorney then asked if a woman who needed to avoid all possible exposure to fumes, gases, odors; with individuals wearing strong perfume or deodorant; and who also must avoid office equipment such as toner and cleaning supplies would be able to perform Pellin's past work.  The VE answered that under those circumstances Pellin would be unable to work as a general office clerk or in any other occupation.  (Tr. 43).

### Dr. Tuteur's Medical Source Statement

Dr. Tuteur prepared a Medical Source Statement (MSS) for Pellin's request for review submitted to the Appeals Council dated June 28, 2012.  Dr. Tuteur was given a copy of the ALJ's entire decision and responded to it.  In the MSS, Dr. Tuteur cited two sets of "unequivocal objective data that not only support, but confirm the diagnosis": (1) intermittently documented measured airflow obstruction by measurements during pulmonary function studies and (2) Methacholine challenge test that is markedly positive (LC20=2mg/ml) confirming the presence of bronchial reactivity.  Dr. Tuteur also stated that exposures that most would consider "miniscule to mild" have the potential to cause severe exacerbation and progressive airway obstruction for Pellin.

---

[8] DICOT 209.562-010 (G.P.O.), 1991 WL 671792.

Dr. Tuteur strongly reiterated his opinion that Pellin needed to totally avoid all exposure to triggers. He further explained that Pellin's condition caused "hyper-responsiveness to ubiquitous irritants and environmental conditions in all of our day-to-day lives." He finished the MSS by stating "It is the need for the environmental control that renders Ms. Pellin disabled from returning to the workplace." (Tr. 700-06).

## Legal Standards

Upon review, a court must determine whether the Commissioner's findings are supported by substantial evidence based on the record as a whole. *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009). Substantial evidence is less than preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome. *Id.* Nor may the court reverse because the court would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*,

188 F.3d 1047, 1050 (8th Cir. 1999)).  To determine whether the decision is

supported by substantial evidence, the court is required to review the

administrative record as a whole and to consider:

> (1) credibility findings made by the Administrative Law Judge;
> (2) the claimant's age, education, background, and work history;
> (3) medical evidence from treating and consulting physicians;
> (4) the claimant's subjective complaints relating to exertional and nonextertional impairments;
> (5) any corroboration by third parties of the claimant's impairments; and
> (6) testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527

(8th Cir. 1980).

Disability is defined as the inability to do any substantial gainful activity by

reason of any medically determinable physical impairment which can be expected

to result in death or which has lasted or is expected to last for a continuous period

of at least 12 months.  20 C.F.R. § 404.1505(a).  To determine if a claimant is

disabled, the Commissioner must follow a five-step sequential evaluation process.

20 C.F.R. § 404.1520.  First, the Commissioner must determine if the claimant is

engaged in substantial gainful activity.  Second, the Commissioner must determine

if the claimant has a "severe" impairment or combination of impairments that

severely limit the claimant's ability to do basic work activities.  Third, if the

claimant has a severe impairment or combination of impairments the

Commissioner must determine if the impairments meet or equal one found in 20

C.F.R., Subpart P, Appendix 1.  Fourth, the Commissioner must determine if the

claimant has the residual functional capacity (RFC) to perform past relevant work.

A claimant who has the RFC to perform past relevant work is not disabled.  If the

Commissioner determines that a claimant cannot perform past relevant work he

must determine if the claimant is capable of performing other work in the national

economy.  20 C.F.R. § 404.1520; § 416.1520.

## The ALJ's Findings

On March 28, 2012, the ALJ issued his decision finding that Pellin was not

disabled under Title II or Title XVI of the Social Security Act from November 13,

2006, through the date of his decision.  In his decision the ALJ made the following

findings of fact and conclusions of law:

> 1.      The claimant meets the insured status requirements of the
> Social Security Act through December 21, 2010.
> 2.      The claimant engaged in substantial gainful activity during the
> following periods:  February 2009 through September 2010 (20 CFR
> 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*.).
> 3.      [T]here has been a continuous 12-month period(s) during which
> the claimant did not engage in substantial gainful activity.  The
> remaining findings address the period(s) the claimant did not engage
> in substantial gainful activity.
> 4.      The claimant has the following severe impairments: chemically
> induced bronchial reactivity; and history of asthma (20 CFR
> 404.1520(c) and 416.920(c)).
> 5.      The claimant does not have an impairment or combination of
> impairments that meets or medically equals the severity of one of the
> listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20

CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6. [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations; she must avoid even moderate exposure to fumes, odors, dust, and gases.

7. The claimant is capable of performing past relevant work as a general office clerk. This work does not require the performance of work-related precluded by the claimant's resident functional capacity (20 CFR 404.1565 and 416.965).

8. The claimant has not been under a disability, as defined in the Social Security Act, from November 13, 2006, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

The ALJ concluded that Pellin was not credible and that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not supported by objective medical evidence. The ALJ stated that he would have expected a regular pattern of visits to the emergency room if Pellin's exposures to various triggers were as severe as she claimed. He also stated "the claimant may be motivated to be a 'stay-at-home-mom' free from the burden of incurring day care costs." He also concluded that Pellin's ongoing worker's compensation claim might have been a motivating factor.

The ALJ stated that he did not consider the opinion of the State Agency single decision maker. He also gave no weight to a vocational report from Sherry Browning because she made medical conclusions without training, was not consistent with the opinions of other medical sources, and apparently had been hired for the workers' comp claim.

## Discussion

A court cannot reverse an ALJ's decision simply because the court may have reached a different outcome, or because substantial evidence might support a different outcome. *Jones ex rel. Morris v. Barnhard*, 315 F.3d 974, 977 (8th Cir. 2004). Instead the court's task is to determine whether there is substantial evidence on the record as a whole to support the ALJ's decision. *Moore*, 572 F.3d at 522. On appeal, Pellin alleges four points of error in the ALJ's opinion. The first is that the ALJ failed to consider evidence that the work for her husband was not SGA. Second, Pellin claims ALJ's RFC assessment is not supported by substantial evidence because the ALJ failed to discuss and explain his analysis or the medical evidence he based his findings on. Third, Pellin alleges that the ALJ failed to analyze or explain why he rejected the opinions of her treating physician, Dr. Tuteur. Finally, Pellin contends that the ALJ improperly based his conclusions on facts not in the record and that the VE's assessment was improperly drawn from these facts. Because I conclude that the ALJ erred by discounting and disregarding Dr. Tuteur's opinions without explanation or analysis in making his RFC determination, I will reverse the final decision of the Commissioner.

## RFC Determination

The opinion of a treating physician is accorded special deference under the social security regulations. *Prosch*, 201 F.3d at 1012. A treating physician's

opinion regarding an applicant's impairment will be granted "controlling weight," provided the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] the record." *Id*. at 1012-13 (citing 20 C.F.R. § 404.1527(c)(2)); *see* § 416.1527(c). Whether the ALJ grants little or great weight to a treating physician's opinion, he must "always give good reasons" for the weight given. § 404.1527(d)(2); *see* SSR 96-2p. The ALJ is not limited to considering medical evidence in his RFC assessment, but the ALJ must always consider some evidence from a medical professional because a claimant's RFC is a medical question. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). Pellin claims that the ALJ failed to adequately explain why he discounted Dr. Tuteur's medical opinion in forming his RFC assessment and I agree.

Dr. Peter Tuteur has been Pellin's sole treating physician since February 7, 2010. He is a pulmonary specialist. The ALJ devotes one short paragraph to discussing and analyzing Dr. Tuteur's opinions:

> The Undersigned gives some weight to the opinion from Dr. Tuteur, who opined that the claimant is disabled to the extent that she is intermittently unable to work in an environment, which, from time to time, may contain triggers (Exhibit 8F/1). Dr. Tuteur elaborated further that medications blunt inadvertent breaches in prescribed environmental control but the claimant's condition is permanent, and she could return to work if fastidious environmental controls can and will be maintained at all times, including perfumes, cologne, hairspray, solvents, smoke, and dust (Exhibit 6F). It appears that she had such an environment when she worked for her husband.

(Tr. 20).  The ALJ then uses a different assessment of Pellin's impairments in his analysis.  Even when a treating physician's opinion is not given controlling weight it is entitled to deference and must be evaluated using multiple factors.  20 C.F.R. § 404.1527(c).  And while the Commissioner need not discuss every piece of evidence in detail, he still must provide "good reasons."  § 404.1527(d).

First the ALJ describes Pellin's pulmonary impairments as requiring that she "avoid even moderate exposure to fumes, odors, dust, and gases."  Dr. Tuteur stated that based on his examinations and Pellin's medical records, Pellin needed to totally avoid exposure to triggers including dust, odors, solvents, hairspray, smoke, and cologne.  (Tr. 536).  Dr. Tuteur also stated that Pellin is unable to work in an environment where any exposure to triggers occurs even from time to time.  An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more through medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  *Prosch*, 201 F.3d at 1013.  In the instant case, the ALJ did not discount or discredit Dr. Tuteur's opinions on the basis of better or more though medical evidence.  Dr. Tuteur has been Pellin's sole treating physician since February 2010 and is a specialist in pulmonary diseases and CIDS.  Therefore his opinion should be given more weight.  *See* 20 C.F.R. 404.1527(c)(5).  The ALJ also failed to point to any medical evidence he gave

"greater weight" to than Dr. Tuteur's or cite the opinions of any other physicians that treated or examined Pellin.

Although an ALJ may disregard medical opinions because they are conclusory, *see  Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010), he must say so.  However, in this case Dr. Tuteur's opinions are supported by medically acceptable clinical and laboratory diagnostic techniques, including the methacholine challenge test, pulmonary function reports, and physical examinations starting in 2010.  The tests repeatedly show that Pellin experiences symptoms whenever exposed to triggers, despite her best efforts to control her environment.  As mentioned above, Dr. Tuteur is the Director of the Washington University Pulmonary Disease Center and is a noted expert in the field.  He has also examined Pellin's entire medical record and incorporated it into his own findings.  Further, the ALJ does not cite any medical opinion to support his conclusion that Pellin must avoid "even moderate exposure."  Dr. Tuteur's conclusions are also consistent with those of Dr. Sardina and Dr. Sincox, who referred Pellin to Dr. Tuteur.

The ALJ also did not cite any inconsistencies between Dr. Tuteur's opinions and those of other treating physicians.  Dr. Tuteur's opinions are consistent both with his notes and other evidence in the record.  Dr. Tuteur consistently states that Pellin needs to "totally avoid" exposure to triggers and that any exposure will

further exacerbate her condition.  He is also consistent in his opinion that Pellin is unable to work because of her impairments.  These opinions can be found in both the records before the ALJ and Dr. Tuteur's MSS prepared for the Appeals Council.   Nor does the ALJ point to any internal inconsistencies between the doctor's medical opinions and his notes or any other documents that would justify discounting or disregarding Dr. Tuteur's opinion.  The ALJ's failure to explain why he reached a different assessment of Pellin's impairments while giving Dr. Tuteur's opinions "some weight" renders the ALJ's decision unclear.  *See McCadney v. Astrue*, 519 F.3d 764, 767 (8th Cir. 2008) (An ALJ can discount a treating physician's opinion, but must explain why).

Furthermore, other evidence in the record supports Dr. Tuteur's opinions.  In her journal entries, Pellin details occasions where her impairments made it nearly impossible to engage in many daily activities.  For example, she was on her way to Schnucks when she stopped behind several UPS trucks.  The fumes from the exhaust forced her to pull over and stop at her in-laws' house to recover.  Other incidents include being unable to walk through clothing aisles at stores because of the formaldehyde, being unable to fill her car with gasoline and drive home because of exposure to fumes, and experiencing symptoms after being exposed to the odors found in the mail.  These events do not support the ALJ's contention that Pellin is able to deal with her impairments with only "minimal issues."  It is not the

case as the ALJ states, that attempting to occasionally go to stores or leave the house means Pellin is not disabled. *Cf. Thomas v. Sullivan*, 876 F.2d 666, 869 (8th Cir. 1989) (Stating that a claimant need not prove she is bedridden or completely helpless to be found disabled) (internal quotation marks omitted).

The evidence above would preclude Pellin from working as a general clerk. According to the *Dictionary of Occupational Titles*, the duties of a general clerk include "[addressing] envelopes or packages," and "[r]eceives money from customers and deposits them in bank." DICOT 209.562-010 (G.P.O.), 1991 WL 67192. It is highly unlikely that Pellin would be able to perform such work in spite of her impairments if she must "totally avoid" exposure to triggers including, ink, toner, and ambient perfume as stated in Dr. Tuteur's opinion.

The ALJ also incorrectly stated part of Dr. Tuteur's opinion. In his decision, the ALJ stated, "The undersigned notes that no doctor has indicated that the claimant is totally disabled." (Tr. 21). This statement does not accurately reflect the record. Dr. Tuteur described Pellin as "totally and permanently disabled" twice. (Tr. 554, 579). While the defendant is correct that the determination of whether or not a claimant is disabled is ultimately one for the Commissioner, 20 C.F.R. § 404.1527(d)(1), this does not explain why the ALJ included a wholly inaccurate statement to support his determination. Such a contradiction indicates that the ALJ failed to properly analyze Dr. Tuteur's assessment.

Finally, the ALJ discredits Pellin primarily on the basis of speculation not supported anywhere in the record. The ALJ speculated that Pellin did not want to work because she desired to be a stay-at-home mother and avoid the cost of daycare. The ALJ does not point to any evidence on the record to support this assertion beyond the fact that Pellin is a mother and her children live at home.

This court is also required to consider evidence submitted to the Appeals Council that was not before the ALJ at the time of the hearing. *Frankl v. Shalala*, 47 F.3d 935 (8th Cir. 1994). The court must determine whether, if the new evidence had been before the ALJ, there would continue to be substantial evidence on the record as a whole to support the ALJ's decision. *Richmond v. Shalala*, 23 F.3d 441, 444 (8th Cir. 1994).

After the ALJ issued his decision it was shown to Dr. Tuteur. Dr. Tuteur responded to the ALJ's findings in a Medical Source Statement (MSS) submitted to the Appeals Council. A MSS is a source of "objective medical evidence." *See Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). In his MSS, Dr. Tuteur reiterates his opinion that Pellin must totally avoid any exposure to triggers to prevent the exacerbation of her condition. (Tr. 700-706). When the MSS is combined with the lack of medical evidence the ALJ cites in his RFC determination, I conclude that the ALJ's decision is not supported by substantial evidence.

Because Dr. Tuteur's opinions about the severity of Pellin's impairments and her inability to work are consistent with his own records and the record as a whole, the ALJ erred by discounting them. He also erred by not explaining why he only gave only "some weight" to Dr. Tuteur's opinions, but does not cite any physician whose opinions he assigned greater weight. The ALJ needed to give "good reasons" for discounting or disregarding Dr. Tuteur's opinions. The ALJ's RFC determination and his determination that Pellin can perform past relevant work as a General Clerk are not supported by substantial evidence on the record as a whole. I reverse the Commissioner's decision and remand this case for further proceedings consistent with this memorandum and order.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and this case is remanded under sentence four of 42 U.S.C. § 405(g) for the reasons stated herein.

A separate judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 7th day of January, 2015.